**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Robert J. Lukacz, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

I, Robert Lukacz, being first duly sworn, hereby depose and state as follows:

2. I have been a full time Police Officer since December 1998. From December 1998 to June 2002, I was employed as a police officer by the City of Portsmouth, New Hampshire. From June 2002 to July 2003, I was employed as a police officer by the Montgomery County, Maryland Police Department. In 2003, I returned to New Hampshire. I have been employed as a police officer by the City of Portsmouth, New Hampshire, from July 2003 to the present.

3. Since September 2017, I have been assigned as a TFO with DEA's Portsmouth District Office Tactical Diversion Squad (TDS), where my primary duties are to investigate the distribution of controlled substances including oxycodone, methamphetamine, heroin, fentanyl, and other substances in violation of state and federal drug laws, including Title 21, United States Code, Sections 841 and 846.

4. As a DEA TFO, I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I am familiar with the benefits and limitations of these techniques. I have also reviewed recorded conversations and telephone, financial, and drug records. I have also become familiar with the manner in which narcotics organizations use various forms of violence and intimidation in furtherance of their narcotics trafficking activity to protect their operations, members, narcotics, and narcotics proceeds.

5. The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, information received from other law enforcement officers, including their direct examination of relevant documents, and physical surveillance conducted in connection with persons and places mentioned in this affidavit. The purpose of this affidavit is limited to showing that probable cause exists to support the issuance of a search warrant.  Accordingly, while this affidavit contains all the material information, I am aware of that is pertinent to the requested search warrant, it does not include each and every fact known by me or other investigators concerning the investigation.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in **Attachment A** contains evidence related to 21 U.S.C. § 841, 843, and/or 846 as described in **Attachment B**.

## JURISDICTION

8. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the United States District Court in the District of New Hampshire is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).  Meta is in the District of Northern California, a district in which the provider is located or in which the wire or electronic communications, records, or other information are stored." 18 U.S.C. § 2711(3)(A)(ii).

## PROBABLE CAUSE

9. On or about February 2, 2022, DEA Diversion Investigators began an active diversion investigation at a hospital located in Keene, New Hampshire.  Due to an internal "self-report" by the hospital, the Keene Police Department was notified that between three hundred to four hundred (300-400) bags of Fentanyl were missing from the hospital and believed to have been stolen.  Each bag contained 50 milliliters of a mixture of saline and 2500 micrograms of Fentanyl.

10. On or about February 1, 2022, a nurse at the hospital's Intensive Care Unit ("ICU") went into the Omnicell System (a large vending machine system for medications) to retrieve a 50mL bag of Fentanyl.  The bag contains 2500 micrograms of Fentanyl that is diluted in 50mL of saline solution.  The Omnicell advised the nurse that the bag had already been removed from the machine by another nurse named Alexandra Towle.  Towle was an ICU Nurse

but was not working in the ICU that day. The nurse then went and spoke with Towle about the discrepancy. Towle, who was on duty but not in the ICU that day, denied taking the Fentanyl and explained that there must have been an error within the machine. The following day, Towle was interviewed by Human Resources personnel and her supervisor about the incident. Towle admitted to taking the Fentanyl and left the room to retrieve one of the stolen bags. Towle returned a few minutes later with one of the bags of Fentanyl. Towle was then escorted from the property and suspended indefinitely. An audit was conducted of the inventory of the medications and large discrepancies were found. The audit was able to show that Towle was likely responsible for taking approximately two hundred (200) bags of Fentanyl from the Hospital in the month of January 2022 alone. A further audit determined that Towle had been stealing bags of Fentanyl as far back as August of 2021 for a combine total of over three hundred (300) bags.

11. On February 3, 2022, Keene, New Hampshire Police Detective Donald Lundin spoke with Towle over the phone. Towle agreed to a meeting with Detective Lundin but advised that she wanted to speak with an attorney first. Detective Lundin later spoke with Towle who advised that she had consulted with an attorney who advised her not to speak to law enforcement.

12. On February 4, 2022, Towle contacted a co-worker and close friend at the hospital, an individual I will refer to as "S.M." During that phone call, Towle advised S.M. that she had been suspended from the hospital for stealing the bags of Fentanyl. Towle admitted to S.M. that she had taken over two hundred (200) bags in the month of January 2022. Towle explained that she was addicted to Fentanyl and that she and her fiancé, who I will refer to as "D.G.," were using fentanyl together. Towle then asked S.M. to take more bags of Fentanyl

4

from the hospital for Towle. S.M. refused Towle's request and later notified her supervision at the hospital.

13. On February 9, 2022, Bureau Chief of Investigations at the Board of Nursing and Pharmacy Certifications Michael Porter contacts Towle over the phone. During the conversation, Towle admitted to stealing the Fentanyl from the hospital. Porter then advised Towle that her Nursing License would be suspended if she did not voluntarily surrender her certification. Towle agreed and signed a document advising that she would not practice nursing until the investigation was completed.

14. On March 3, 2022, Towle committed suicide at her residence in Alstead, New Hampshire. During the course of the death investigation by the Alstead Police Department, the Chief of Police seized Towle's cell phone. The phone was later transferred to the Keene Police Department, at the request of Agents with the DEA.

15. On or about March 4, 2022, D.G., Towle's fiancé left New Hampshire and moved in with his parents in Las Vegas, Nevada.

16. On March 8, 2022, DEA Agents from the Portsmouth Tactical Diversion Squad ("TDS") responded to the Keene Police Department and took custody of Towle's cell phone, an Apple iPhone. Several attempts were made to retrieve the information from Towle's iPhone but all efforts to access the phone were unsuccessful.

17. Later on March 8, 2022, TDS Agents met with DEA Diversion Investigators and retrieved video surveillance footage of Towle taking bags of Fentanyl from the Omnicell at the hospital on a day that she was not scheduled to work. In the video footage, Towle can be seen wearing plain clothes, not hospital scrubs, while taking several Fentanyl bags from the Omnicell

machine.  It is uncommon to take as many bags of the Fentanyl as she did for one patient or even several patients.

18.     On March 24, 2022, Agents from TDS spoke with S.M. again.  S.M. advised that Towle was a very conservative person before she met her fiancé, D.G.  S.M. explained that after meeting D.G., Towle's behavior changed drastically.  According to S.M., Towle became very liberal with her spending habits and S.M. noticed signs of suspected drug use on both Towle and D.G.  S.M. went on to explain that she learned that D.G. was a recovering drug addict and had recently been enrolled in a rehabilitation facility.  S.M. stated that she believed that D.G. had convinced Towle to steal the Fentanyl bags on D.G.'s behalf and that D.G. was distributing the bags through the mail.

19.     As of May 2022, none of the stolen bags of Fentanyl have been recovered from Towle, leading me to conclude that they were sent out of the area.  Furthermore, the amount of Fentanyl that was stolen is far more than what would typically be considered personal use quantities and therefore, likely could not have been consumed by Towle and D.G. alone.

20.     Therefore, there is probable cause to believe that Towle's Facebook or Meta account contains information regarding the diversion of Fentanyl that Towle admitted to taking from the hospital.  It is further believed that the account contains evidence of the diversion of Fentanyl including, but not limited to, images, discussions via text message, and telephone calls to other suspected co-conspirators.

21.     Through process served on Meta, we have identified the account described in Attachment A as belonging to Towle.  A preservation letter was sent to Meta to preserve the information assigned to Towle's Meta account from May 2021 to May 2022.

22.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

23.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

24.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

25.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these

privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

26. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

27. Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

28. Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. of the date of each call. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

8

29. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

30. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

31. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

32. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

33. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

34. In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

35. Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

36. Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

37. Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

38. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as

described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

39. Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

40. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

41. Based on the foregoing, I request that the Court issue the proposed search warrant.

42. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

43. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

/s/ Robert J. Lukacz
Robert J. Lukacz
Task Force Officer, DEA

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application this __8th__ day of ____July____, 2022.

_____
THE HONORABLE ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with Facebook account www.facebook.com/ali.towle.1 with User ID**:** 100000116505951 that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities **May 2021 to May 2022**;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them **May 2021 to May 2022**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

    numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f) All other records and contents of communications and messages made or received by the user **May 2021 to May 2022**, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g) All "check ins" and other location information;

(h) All IP logs, including all records of the IP addresses that logged into the account;

(i) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j) All information about the Facebook pages that the account is or was a "fan" of;

(k) All past and present lists of friends created by the account;

(l) All records of Facebook searches performed by the account ;

(m) All information about the user's access and use of Facebook Marketplace;

(n) The types of service utilized by the user;

(o) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

3

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within a period not to exceed fourteen (14) days of issuance of this warrant.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 21 U.S.C. § 841, § 843(a)(3), § 843(b) and § 846, since January 1, 2021, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a)  Possession with Intent to distribute and distribution of a controlled substance, acquiring controlled substances by misrepresentation, fraud, forgery, deception or subterfuge, use of a communication facility to commit a controlled substance offense, and conspiracy to commit a controlled substance offense.

(b)  Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(c)  Evidence indicating the account owner's state of mind as it relates to the crimes under investigation;

(d)  The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(e)  The identity of the person(s) who communicated with the user ID about matters relating to Possession with Intent to Distribute a Controlled Substance and Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance, including records that help reveal their whereabouts